# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

TREVOR WALTERLAKES, and
KIMBERLEY MAHABAL, individually and
on behalf of all others similarly situated,

                            Plaintiffs,

       v.

FROM YOU FLOWERS, LLC,

                          Defendant.

Case No. 1:25-cv-00867

**<u>CLASS ACTION COMPLAINT</u>**
1.  Violations of the Consumer Protection
    Acts of 50 States
2.  Violation of California Consumers Legal
    Remedies Act
3.  Violation of California False Advertising
    Law
4.  Violation of California Unfair
    Competition Law
5.  Violation of New York Deceptive and
    Unfair Trade Practices Act
6.  Violation of False Advertising of the
    New York Deceptive Acts and Practices
    Act

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

**Page No.**

I. INTRODUCTION ................................................................................................ 1

II. PARTIES ............................................................................................................ 4

III. JURISDICTION ................................................................................................. 4

IV. VENUE ............................................................................................................... 4

V. FACTUAL BACKGROUND ............................................................................. 4

    A. Companies Use Bait-and-Switch "Drip Pricing" to Manipulate Consumers ......... 4

    B. Defendant's Bait-and-Switch Tactics ................................................................. 11

        1. The Browsing Stage: .................................................................... 12

        2. The Product Attribute Selection Stage: .................................... 13

        3. Purchase Initiation Stage: ......................................................... 15

        4. Login, Create Account, or Guest Checkout Stage: .................. 16

        5. Delivery Information Stage: ....................................................... 16

        6. Billing Information Stage: .......................................................... 17

        7. Review Order Stage .................................................................... 18

    C. Other Companies Do Not Rely on Drip Pricing to Drive Their Sales ................. 24

    D. Defendant's Drip Pricing Runs Afoul of Federal and State Law ......................... 25

    E. California Prohibits Bait-and-Switch Pricing and Drip Pricing Schemes ........... 26

    F. Many Other States Prohibit Bait and Switch Advertising and Drip Pricing Schemes ................................................................................................................ 28

    G. Plaintiffs' Claims ................................................................................................. 29

VI. CLASS ALLEGATIONS .................................................................................. 33

VII. CLAIMS FOR RELIEF .................................................................................... 37

    COUNT I ....................................................................................................... 37

    COUNT II ...................................................................................................... 43

    COUNT III ..................................................................................................... 46

COUNT IV ........................................................................................................... 47

    "Unfair" Prong ............................................................................................ 47

    "Fraudulent" Prong ..................................................................................... 48

    "Unlawful" Prong ....................................................................................... 49

COUNT V ............................................................................................................. 51

COUNT VI ............................................................................................................ 53

VIII.   PRAYER FOR RELIEF .......................................................................................... 54

IX.    JURY TRIAL DEMANDED ................................................................................... 56

## I.    **INTRODUCTION**

1.    Defendant From You Flowers, LLC ("Defendant") systematically cheats consumers out of millions of dollars annually by employing a deceptive and illegal bait-and-switch pricing scheme.

2.    Rather than transparently disclosing the full cost of the floral arrangement and/or gift item delivery offered through its e-commerce platform, Defendant instead adds on previously undisclosed "Surprise Fees" to every product purchased, right before the buyer finalizes the transaction. These Surprise Fees, often labeled as "delivery fees," are fees and charges that Defendant does not disclose to consumers at any point prior to the final stage of the transaction and are actually a hidden part of the total price a consumer must pay for each product purchased via its e-commerce platform.

3.    Defendant lures consumers into purchasing floral arrangements and/or other gift items from Defendant's website by advertising artificially low prices for their service while hiding the amount of Surprise Fees that Defendant charges for each product. Specifically, Defendant advertises misleadingly low prices that do not include added fees. Only at the latest point in checkout does Defendant for the first time, list a total amount that includes the Surprise Fees, after consumers have already engaged in a lengthy, multi-step process, requiring numerous decisions and inputs from the consumer, including: (a) selecting a particular arrangement at its advertised price (that does not include fees); (b) evaluating the intended arrangement and determining whether they would prefer the Regular, Deluxe, or Premium version; (c) considering whether they would like to include an optional add on in their order, such as a one to five mylar balloons; a small, medium, or large box of chocolates; or a teddy bear; (d) selecting whether they would like to have the item delivered on a "high traffic" date for an added fee of $2.99; (e) selecting a note type for inclusion in the order; (f) inputting who the note should be from; (g) inputting a custom message for the note (while taking care to ensure this message stays within the character limit); (h) determining whether they would like to login in to their From You Flowers account (or whether they would like to create one); (i) entering the recipient's information, such as their title, first and

last name, address; (j) inputting a phone number and email for the order; (k) indicating whether they would like at pay an extra $4.99 to ensure the arrangement is delivered before 12 PM in the recipient's time zone; (l) entering payment details for the order; (m) inputting their payment details; (n) adding the value of an existing gift card toward the purchase; and (o) selecting whether they would like Defendant to store their payment information for express checkout on a later purchase.

4.       Defendant's pricing scheme is designed to burn through consumer time and hassle them into acquiescing to the Surprise Fee applied to each product. Even when a consumer does not ultimately consent to the Surprise Fee and instead abandons their cart, Defendant has still harvested their personal data. Because the consumer must enter their email address before the total price is displayed, Defendant emails consumers who abandon their cart with additional promotions. In some instances, Defendant will email consumers who abandon their cart after seeing the Surprise Fee and offer them a chance to buy the flowers at the original advertised price – without the Surprise Fee. Thus, for some consumers the Surprise Fee is optional if they refuse to pay it.

5.       The goal of Defendant's false advertising is to convince consumers shopping for a floral arrangement that Defendant's goods and services are cheaper than they really are, and trick them into paying a higher price per product.

6.       These Surprise Fees—also commonly called "Junk Fees," including by the Federal Trade Commission ("FTC")[1]—have recently been the subject of national media attention, including during President Biden's 2023 State of the Union Address.

---

[1] As defined by the FTC, "Junk Fees" are "unfair or deceptive fees that are charged for goods or services that have little or no added value to the consumer" or fees that are "hidden," such as those disclosed only at a later stage in the consumer's purchasing process or not at all. *Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011*, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (to be codified at 16 C.F.R. pt. 464), *available at* https://www.federalregister.gov/documents/2022/11/08/2022-24326/unfair-or-deceptive-feestrade-regulation-rule-commission-matter-no-r207011 (cleaned up).

CLASS ACTION COMPLAINT

7.    As President Biden explained, "too many companies" are charging "hidden surcharges … to make you pay more. [J]unk fees may not matter to the very wealthy, but they matter to most other folks in homes like the one I grew up in, like many of you did. They add up to hundreds of dollars a month. They make it harder for you to pay your bills[.]"[2]

8.    Junk Fee practices—like Defendant's—are not just deceptive. They are illegal.

9.    As a result of Defendant's false advertising, Plaintiffs and the proposed class have suffered damages. They purchased floral arrangements they would not otherwise have bought and paid fees they would not otherwise have paid had they not been drawn in by Defendant's deceptively low prices. Consumers have also had their data collected for commercial purposes, under the guise of a falsely listed price that Defendant has no intention of honoring.

10.    Junk Fees violate FTC Rules and Guidance, as well as state consumer protection statutes, which require businesses to sell goods and services for their advertised prices. Defendant's misleadingly advertised product prices, a bait-and-switch scheme, constitutes false and misleading advertising in violation of the Consumer Protection Acts of the 50 states, including California's Unfair Competition Law (the "UCL") (Cal. Bus. & Prof. Code § 17200); California's False Advertising Law (the "FAL") (Cal. Bus & Prof. Code § 17500); California's Consumer Legal Remedies Act (the "CLRA") (Cal. Civ. Code §§ 1750 et seq.); New York's Deceptive Acts and Unfair Trade Practices Act (New York's Gen. Bus. Law § 349); and New York's False Advertising Act (New York's Gen. Bus. Law § 350).

11.    Plaintiffs bring this action under the CLRA, UCL, and FAL, to stop Defendant from falsely advertising the price of its floral arrangements throughout 50 states and to residents of the United States and force Defendant to pay back the tens of millions of dollars in unlawful Surprise Fee revenues it has taken from consumers together with statutory penalties and punitive damages.

/ / /

/ / /

---

[2] *President Biden's State of the Union Address,* White House, https://www.whitehouse.gov/stateof-the-union-2023/ (last visited Jan. 4, 2025).

CLASS ACTION COMPLAINT

## II.    PARTIES

12.    **Plaintiff Trevor Walterlakes** is a resident of Los Angeles, California

13.    **Plaintiff Kimberley Mahabal** is a resident of Schenectady, New York.

14.    **Defendant From You Flowers** is a limited liability company incorporated in Connecticut, which maintains a principal place of business at 483 West 10th Avenue, 6th Floor, 10018 New York, New York.

## III.    JURISDICTION

15.    This court has original jurisdiction over the action pursuant the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## IV.    VENUE

16.    Venue is proper in this District under 28 U.S.C. § 1391 because Defendant maintains a principal place of business in this District, from which it has marketed, advertised, and sold the Products to Class Members around the country.

## V.    FACTUAL BACKGROUND

### A.    Companies Use Bait-and-Switch "Drip Pricing" to Manipulate Consumers

17.    Large, sophisticated corporations—like Defendant— with their large, sophisticated marketing teams, know that "drip pricing" is an effective method of tricking price-sensitive consumers into paying higher prices.

18.    Drip pricing is a tactic employed by e-commerce corporations to psychologically manipulate consumers into paying more than they otherwise would. It is a form of "partitioned pricing," a pricing technique that divides the price of a product into multiple components, such as a base price and additional fees.

19.    The FTC informally defines "drip pricing" as a "technique in which firms advertise only part of a product's price and reveal other charges later as the customer goes through the buying

process. The additional charges can be mandatory charges [] or fees for optional upgrades and add-ons."[3]

20.     The drip pricing process starts with a seller (or, the "drip pricer") listing an item at an attractively low, "bait" price. The bait price will look to the consumer to be the full price of the item.

21.     Lured in, the consumer will then manifest their intent to transact at the advertised price. With a click, the consumer will initiate the multi-step, multi-page online check-out process. The consumer will be directed through a series of pages, being presented with various add-on items, then prompted to enter information relevant to the transaction, such as the shipping address for the item, whether the item is a gift and whether the consumer would like to include an optional gift message to the recipient, the consumer's billing address, and their credit card information.

22.     Only after the consumer has directed significant time and attention to completing the transaction at the initial bait price will they then be confronted with a secondary drip price, a surcharge that they are led to believe they must pay to secure the item. The drip price, often labeled as a "service fee," "convenience fee," "handling fee," or "delivery fee," will surprise the consumer, as it appears only after the consumer has spent their time and energy attempting to secure the item at the initially advertised price, and at the last possible point in the check-out process.

23.     At this point, the seller has the consumer in hand. The consumer is "locked in"[4] and will thus acquiesce to the "switch" price, (the sum of the bait price plus the drip price).

24.     When purchasing any product online, consumers will experience a "Purchase Flow," i.e., the multi-step process by which a consumer completes all the tasks needed to make a purchase, such as browsing, adding items to cart, adding payment information, and ultimately buying the items. Sellers can design straightforward Purchase Flows that make pricing and fees

---

[3] *The Economics of Drip Pricing*, FED. TRADE COMM'N (May 21, 2012), https://www.ftc.gov/news-events/events/2012/05/economics-drip-pricing.

[4] "Customer Lock In" is an economic scenario, where a consumer is dependent on a particular vendor for products, unable to use another vendor without being saddled with substantial switching costs.

transparent throughout and that uses web design that centers the shopper's experience. For example, sellers can transparently post their shipping cost policy in easy-to-see locations early on during the consumer's navigation through the Purchase Flow. On the other hand, online sellers can manipulate reasonable consumers through the design of a Purchase Flow that induces them to pay more for products than they would otherwise. Successful drip-pricing campaigns depend on confusing and lengthy Purchase Flows that confuse and exhaust consumers through the following mechanisms and psychological tactics:

25.    **Usurping Consumer Time**: Drip pricers develop a lengthy Purchase Flow process, from browsing through check-out, which bait the consumer to click through a series of pages that prompt the user to expend significant time filling out information related to the purchase. By sequentially partitioning the check-out process, and only confronting the consumer with the full price after the consumer has spent time and energy inputting information, the drip pricer burns through the consumer's time.[5] This has the effect of "locking in" the consumer, who does not want to continue burning through their time reserves in order to evaluate alternative products and sellers. When consumers are buying time-sensitive items, such as gifts for important occasions, consumers may not even have the time to start the process anew.

26.    **Sunken Cost Fallacy**. Drip pricers weaponize the psychological phenomenon of "sunken cost fallacy," depending on consumers to display this irrational "tendency to continue an endeavor once an investment in money, effort, or time has been made," rooted in the maladaptive "desire not to appear wasteful."[6] Drip pricers structure the lengthy check-out process to feel to the consumer like an expenditure of energy that they will be loath to "undo" by restarting the search for a different item after being presented with the surcharge.

27.    **Mistaken Assumptions That Switching Will Be Futile**. The drip pricer relies on the consumer's mistaken assumption that competing sellers all engage in similar tactics. Because

---

[5] David Adam Friedman, *Regulating Drip Pricing*, 31 STAN. L. & POL'Y REV. 51, 76 (2020).

[6] Hal R. Arkes & Catherine Blumer, *The Psychology of Sunk Cost,* 35 ORG. BEHAV. & HUM. DECISION PROCESSES 124, 124–25 (1985).

the drip pricer is frequently a large, highly profitable e-commerce corporation, the consumer will perceive the corporation as engaging in, or perhaps even setting the standard for, industry-wide pricing tactics. Thus, the consumer will mistakenly assume that all other competitors are also engaging in this deception, and that transacting with a competitor will not spare them from paying an inflated "switch" price.[7] A 2020 Marketing Science study confirms this: after being exposed to "drip pricing," the participants in the study cited seeing "little value" in returning to the search process after being confronted with the dripped surcharge because they believed that "all [corporations] charge similar extra fees."[8]

      28.    **Anchoring and Adjustment Heuristic**. Trailblazing psychologists Amos Taversky and Daniel Kaneman coined the "anchoring and adjustment heuristic," which refers to a cognitive bias where people make decisions by using an initial piece of information as a starting point ("anchor"). People use this anchor as a mental benchmark, or starting point, for estimating value. In the case of drip pricing, the consumer "anchors on the piece of information he or she considers 'most important,' (e.g., the [bait] price), and then adjusts insufficiently for one or more items (e.g., the surcharge), thus underestimating the total price."[9] This cognitive bias has a very real effect on the consumer: those exposed to drip pricing tend to ultimately transact for an item with a lower listed bait price but a higher total switch price due to distortions caused by  "anchoring" and resultant mistakes in calculating the item's actual, overall cost.[10] Said another way, consumers underestimate the total price when presented with drip or partition pricing, as they often entirely disregard the Junk Fee because of the cognitive costs and effort involved in adding the partitioned prices. Due to "anchoring", as companies that engage in Junk Fee practices are well aware,

---

[7] Shelle Santana et al., *Consumer Reactions to Drip Pricing*, 39 MKTG. SCI. 188, 197 (2020), https://doi.org/10.1287/mksc.2019.1207.

[8] *Id.*

[9] *See* Gorkan Ahmetoglu et al., *Pricing Practices: A Critical Review of their Effects on Consumer Perceptions and Behavior,* 21 J. RETAILING & CONSUMER SERV. 696, 696 (2014), https://doi.org/10.1016/j.jretconser.2014.04.013.

[10] Shelle Santana et al., *Consumer Reactions to Drip Pricing*, 39 MKTG. SCI. 188, 188 (2020), https://doi.org/10.1287/mksc.2019.1207.

CLASS ACTION COMPLAINT

consumers choose a product or service based on the advertised bait price, and not based on the drip price or partitioned price, especially when the Junk Fee is not adequately disclosed.[11]

29.     **Decision Fatigue**. E-commerce platforms that engage in drip pricing present the Surprise Fee at the latest possible moment during the check-out process, after the consumer has purposefully been steered through a series of cognitively taxing decisions. These decisions may include: what model, color, and size of a particular item the consumer may want; how and when they consumer may wish to have the item delivered to them; whether or not the consumer would like to upgrade to a premium version of the product; and whether the consumer would like to add on accessories to the purchase for an additional fee. "Making decisions over extended periods of time is cognitively taxing and can lead to decision fatigue, which is linked to a preference for the 'default' option, namely whatever decision involves relatively little cognitive effort."[12] "Such effects have been demonstrated across a number of applied settings, including forensic and clinical contexts."[13] E-commerce platforms purposefully cognitively tax consumers before presenting them with dripped prices, knowing that the consumer is more likely to succumb to the drip price because stomaching it will involve less cognitive effort than restarting their search for a suitable good in the online marketplace.

30.     **Difficulty in Price Comparison**. When a Junk Fee is hidden and/or partitioned, consumers cannot reasonably compare the cost of a product or service across available options within a company or across companies. Consumers might have to follow multi-step Purchase Flow on multiple sellers' websites to figure out the true price of the products. Further complicating price

---

[11] Alexander Rasch et al., *Drip Pricing and its Regulation: Experimental Evidence*, 176 J. ECON. BEHAVIOR & ORG. 353 (2020), https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189 ("buyers [] based their purchase decision exclusively on the base price").

[12] Tobias Baer & Simone Schnall, *Quantifying the Cost of Decision Fatigue: Suboptimal Risk Decisions In Finance*, 8 Royal Soc'y Open Sci. 5, 5 (2020) https://pmc.ncbi.nlm.nih.gov/articles/PMC8097195/.

[13] Tobias Baer & Simone Schnall, *Quantifying the Cost of Decision Fatigue: Suboptimal Risk Decisions In Finance*, 8 Royal Soc'y Open Sci. 5, 5 (2020) https://pmc.ncbi.nlm.nih.gov/articles/PMC8097195/.

CLASS ACTION COMPLAINT

comparisons is the way in which Google search displays obscure the true cost of some products. Many consumers will often run searches on Google as an initial first step in buying a product, and in response, Google often displays an assortment of products and their associated sellers and prices. Typically only the base price is displayed, so sellers can entice consumers to visit their website by artificially reducing the base price by partitioning more of it into fees that get disclosed later in the process.

31.    In 2021, the University of California, Berkeley, ran an experiment on StubHub Users to better understand the mechanics of drip pricing.[14] The large-scale field experiment involved tracking individual-level click-stream behavior of millions of consumers: with roughly 50% of them being exposed to dripped prices, and 50% of them being presented the full price, up front.[15] The users that were presented dripped prices more frequently left the check-out process to revisit other listings.[16] They often repeated this behavior multiple times, before purchasing more expensive and higher quality tickets.[17] From this, the study extrapolated that these users struggled with price comparison—misinformation driving them to purchase more expensive goods in higher quantities.[18] Said another way: consumers strongly and systematically underestimate the total price under drip pricing and make mistakes when searching for the best deal, leading them to make purchasing decisions that benefit the seller.[19]

32.    Law Professor David Adam Friedman puts it best: "Serious deception concerns emerge where sellers advertise a price for an offering, but buyers cannot attain the offering after

---

[14] Tom Blake et al., *Price Salience and Product Choice*, 40 MKTG. SCI. 619, 619(2021), https://doi.org/10.1287/mksc.2020.1261.

[15] *Id.* at 620.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] Alexander Rasch et al., *Drip Pricing and its Regulation: Experimental Evidence*, 176 J. ECON. BEHAVIOR & ORG. 353 (2020), https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189.

CLASS ACTION COMPLAINT

starting the transaction without paying a secondary charge."[20] And this serious deception has very real consequences for consumers and for competition in the market. Accordingly, "buyers may be hurt" because "[w]hen there is uncertainty over possible drip sizes . . . consumers more frequently fail to identify the cheapest offer."[21] This outcome is inevitable because consumers exposed to drip pricing "are significantly more likely to 1) initially select the option with the lower base price, 2) make a financial mistake by ultimately selecting the option that has a higher total price than the alternative option, given the add-ons chosen, and 3) be relatively dissatisfied with their choice."[22]

33.     Drip pricing results in the following consequences, among others:

a)  "'[Consumers] end up making purchases that in hindsight they would not have made;'"[23]

b)  Consumers typically spend more than they would have otherwise (one study estimated 21% more);[24]

c)  Consumers feel deceived by those they transact with;[25]

d)  Large e-commerce platforms unjustly enrich themselves by charging consumers fees that do not give consumers additional value. For example, in 2017 alone, the Junk Fee revenue of the U.S. airline and U.S hotel industries was approximately $57 billion and $2.7 billion, respectively;[26]

---

[20] David Adam Friedman, *Regulating Drip Pricing*, 31 STAN. L. & POL'Y REV. 51, 53 (2020).

[21] Rasch et al. *Drip Pricing and its Regulation: Experimental Evidence*, supra note 11.

[22] Santana et al., *Consumer Reactions to Drip Pricing*, supra note 7, at 188.

[23] Morgan Foy, *Buyer Beware: Massive Experiment Shows Why Ticket Sellers Hit You With Last-Second Fees,* BERKELEY HAAS NEWS (Feb. 9, 2021), https://newsroom.haas.berkeley.edu/research/buyer-beware-massive-experiment-shows-why-ticket-sellers-hit-you-with-hidden-fees-drip-pricing/.

[24] *Id.*

[25] Thomas Robbert, *Feeling Nickeled and Dimed - Consequence of Drip Pricing,* 25 J. SERVICE THEORY & PRACTICE 621, 623 (2015).

[26] Shelle Santana et al., *Consumer Reactions to Drip Pricing*, 39 MKTG. SCI. 188, 189 (2020), https://doi.org/10.1287/mksc.2019.1207.

CLASS ACTION COMPLAINT

e)  As FTC Chair Lina Kahn puts it: "Firms that are clear with customers about the total price upfront tend to lose out to deceptive firms that initially show a low price but then charge a much higher one[;]"[27]

f)  Consumer data is gathered under false pretenses and used to later enrich the drip pricer. Under the false pretense of a sale at the bait price, the seller can collect valuable data from the consumer, to build out their lead database and drive future business from consumers even when they did not complete the ultimate purchase. For instance, mere hours after a consumer has abandoned their cart, they will begin to receive marketing content from the drip pricer.

**B.    Defendant's Bait-and-Switch Tactics**

34.    Defendant is a floral wire service company, which brokers orders to local florists for delivery.

35.    Defendant was founded in 2002 by Michael Chapin, its current CEO.[28]

36.    Defendant is a subsidiary of Tenth Avenue Holdings.[29]

37.    Defendant is one of the largest privately held floral wire services in the world. Defendant is affiliated with 20,000 florists worldwide.[30]

38.    "**From You Flowers®** offers a complete selection of personal and corporate floral and gift items appropriate for any occasion and every sentiment. This includes fresh flowers, plants, balloons and gift baskets."[31]

---

[27] *Remarks of Chair Lina M. Khan Regarding the White House Announcement of New Actions to Protect Consumers from Hidden Junk Fees,* FED. TRADE COMM'N (Oct. 10, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/khan-remarks-regarding-junk-fees.pdf.

[28] *From You Flowers in the News,* FROMYOUFLOWERS.COM, https://www.fromyouflowers.com/media.htm (last accessed January 28th, 2025).

[29] @From You Flowers, LINKEDIN, https://www.linkedin.com/company/from-you-flowers/ (last accessed January 27th, 2025).

[30] *About From You Flowers®,* FROMYOUFLOWERS.COM, https://www.fromyouflowers.com/about.htm (last accessed January 27th, 2025).

[31] *From You Flowers in the News,* FROMYOUFLOWERS.COM, https://www.fromyouflowers.com/media.htm (last accessed January 28th, 2025).

39.     A significant portion of Defendant's revenue is driven by Defendant's employment of drip pricing,[32] a deceptive bait-and-switch tactic meant to trick users into purchasing products at a higher price point than they otherwise would have. Using this method, Defendant systematically hassles its customers out of their hard-earned money using a complicated Purchase Flow process that hides the extra fee associated with each product until after a consumer has invested significant amount of time in the purchase.

40.     Screenshots of the entire From You Flowers Purchase Flow are attached as Exhibit A. A consumer who makes a purchase on Defendant's website and navigates that Purchase Flow will experience the drip-pricing scheme as follows:

**1.      The Browsing Stage:**

41.     The Browsing Stage is the part of the process where the consumer compares products and makes their selections. When the consumer visits www.FromYouFlowers.com, there are two general things the consumer does to find a suitable floral arrangement to purchase.

42.     First, as can be seen in Figure 1A, Exhibit A, when visiting www.FromYouFlowers.com, consumers can browse Defendant's website to select a category of arrangement "Occasions" from the drop-down menu toward the top of the homepage. For instance, the consumer may select "Birthday." On the day the Figures in Exhibit A were captured (January 27, 2025), Defendant automatically applied an approximately 20% discount on all floral arrangements, displaying both the original price, which it crossed out, and the discounted price.

43.     Second, as can be seen in Figure 1B, Exhibit A, once the consumer is on the landing page for a particular category of arrangements (here, "Birthday Flowers"), the consumer is presented with an array of floral arrangements, where Defendant advertises a price for each one. For instance, after browsing, a customer will select an arrangement, such as the "Raspberries & Crème" bouquet arrangement, lured by its advertised price of $47.99. There is no indication at this point in the purchase flow that this arrangement, like all others, will be subject to a Surprise Fee.

---

[32] The discovery process will illuminate the exact dollar figure Defendant annually derives from its drip pricing scheme.

44.     During the Browsing Stage of the process, when consumers are on Defendant's home page and any of the landing pages for the various themes and occasions, Defendant omits any information to alert a consumer that additional charges will be added to the price of every product. Nor does Defendant include on these pages any easy-to-locate links where a consumer can learn more about the shipping costs or other fees.

### 2.     The Product Attribute Selection Stage:

45.     During the "Product Attribute Selection Stage," the consumer is prompted to finalize their selection of the product, as well as select other additional add-ons and a delivery date. To finalize their selection of the product, the consumer will click on the image of a particular arrangement that appeals to them, to evaluate the item for potential purchase. For instance, as can be seen in Figure 2A, Exhibit A, in this example, the consumer has selected the From You Flower's "Raspberries & Crème" bouquet arrangement.

46.     While on the product page, the consumer can first investigate the specifications of the arrangement, by: (a) reading the arrangement "Item Description & Details"; (b) viewing and comparing the three available arrangement "Options": Regular ($47.99), Deluxe ($55.99), and Premium ($64.99);

47.     During the Product Attribute Selection Stage, the consumer will be prompted to select the size of the arrangement, by clicking the fillable bubble next to one of the three sizes available. On this page, the "Deluxe" bubble ($55.99) will be pre-selected for the consumer, even though the product was listed at its "Regular" price of $47.99 during the Browsing Stage. Thus, the consumer will need to change their selection back to "Regular" to attempt to transact at the item's initially listed price.



CLASS ACTION COMPLAINT

48.     While on this page, the consumer will also be presented with a choice of potential add-ons, or additional delivery items for an added cost, as seen in Figure 2A, Exhibit A. The consumer is prompted to indicate if they would like to add one to five Mylar Balloons. If the consumer opts to include balloons, they must select how many (out of 5) and what category of balloons (Birthday, Anniversary, Congratulations, Get Well, Good Luck, I Love You, New Baby Boy, New Baby Girl, Thank You, or Thinking of You). The consumer is next prompted to indicate whether they would like to add a small, medium, or large box of chocolates, for an additional $15.00, $20.00, or $25.00, respectively. Then, the consumer is prompted to indicate whether they would like to add a small, medium, or large "Teddy Bear" to their purchase, for an additional $15.00, $20.00, or $25.00, respectively.

49.     After choosing from the plethora of optional add-ons, the consumer next must enter their recipient's Zip Code and select the date of the delivery. As shown in Figure 2B, Exhibit A, the user must select the date of delivery from a pop-up calendar. Some delivery dates require an additional charge of $2.99. While in the "Product Attribute Selection Stage," the consumer is given the option to select a delivery date that will not add an extra charge to their order, or one that will add $2.99 to their order.

50.     Next, the consumer will be prompted to select a card type from a drop-down menu for inclusion in the delivery, as pictured in Figure 2C, Exhibit A. There are fifteen card options to choose from (Blank Card, No Card, Birthday, Sympathy, Funeral, Get Well, Valentine's Day, I Love You, Just Because, Thank You, Congratulations, Anniversary, Missing You, New Baby, or Other). The consumer will be prompted to enter who the message should read as being from and input a message which they customize themselves. The consumer is alternatively given the option to Defendant autogenerate this message. If the consumer writes their own gift message, then they must take care to stay under the 175-character limit.

51.     Finally, the user will click "Add to Cart" enter the next phase.

52.     Throughout the Product Attribute Selection Stage, Defendant does not include any information about shipping costs or other fees, nor any links to refer a consumer to those policies.

Defendant gives no indication that each product listed on their site will be subject to a Surprise Fee.

### 3.    Purchase Initiation Stage:

53.    Once the consumer has made the decision of which size bouquet they desire, chosen from the potential add-ons, entered the recipient's zip code, selected their desired delivery date, selected a card type for inclusion in the delivery, and written a note for the card of less than 175 characters, the customer will click "Add to Cart" and enter the "Purchase Initiation Stage." At this point in the Purchase Flow, the consumer will be directed to their From You Flowers "Your Shopping Cart" Page, as can be seen in Figure 3, Exhibit A.

54.    While viewing their cart, the user will be given the option "Remove [the] Item" from their cart, change the delivery date for the order, and edit the card they've selected for the order. On the right-hand side of the page, an "Order Summary" will appear in a beige text box. Here, three entries are shown. The price of the "Raspberries & Crème" arrangement is listed as $47.99. Just beneath this, in green, an entry for $12.00 is displayed next to "YOU SAVED: Discount Code 11G has been applied" due to the automatic sitewide discount being applied to all orders on the date Exhibit A was prepared. Then, a subtotal is listed as $47.99. This subtotal omits both the Surprise Fee that will later be applied to the order, and any applicable tax.

55.    Nowhere in the "Order Summary" box is there any indication that an additional Surprise Fee will apply to the product. During this stage of the process, Defendant omits any information to alert a consumer that additional charges may be added to the price of each product, as well as any links to its shipping and fee policies. Notably, this step in the Purchase Flow omits the Surprise Fee (here, $14.99 Surprise Fee that the user is led to believe they must pay to buy this floral arrangement).

56.    Once the user has reviewed the "Order Summary", the consumer will click "Continue to Secure Checkout" at the bottom of the page, or Click PayPal Checkout, GPay, or Venmo. This will take them to the next stage in the Purchase Flow.

### 4.    Login, Create Account, or Guest Checkout Stage:

57.    Next, as pictured in Figure 4, Exhibit A, at this stage in the Purchase Flow, the consumer must decide if they would like to (a) login and associate the order with their existing account; (b) create an account (which would involve selecting a username and password), or (c) decline to enter any credentials and to instead "Continue as Guest."

58.    During this stage of the process, Defendant omits any information to alert a consumer that additional charges will be added to the price of the product.

### 5.    Delivery Information Stage:

59.    The consumer will next be brought to the "Delivery Information Page," as can be seen in Figure 5, Exhibit A. Here they will be prompted to fill in a great deal of information and make several choices:

60.    **First**, the consumer will be prompted to enter information about the recipient. For the intended recipient of the floral delivery, the consumer must input the following: title, recipient's first name, recipient's last name, extended info. Then, the consumer must enter in the delivery instructions, including: the delivery street address; whether this location is an apartment; floor, or suite; the city state, and zip; whether the address is a residence, business, funeral home, church, hospital, or school; whether there is an associated business name; the recipient's phone number; and the recipient's phone extension (if there is one).

61.    **Second**, the consumer will be again prompted to add a card type and custom message, or whether they would like Defendant to automatically "Generate New Message." Finally, they must again confirm who the message should read as being from. As before, the consumer must take care to ensure that their message stays within the 175 character limit.

62.    **Third**, the consumer will be asked whether they would like to pay an additional $4.99 for guaranteed morning delivery, before 12 PM in the delivery time zone or if they would like to decline expedited delivery. Importantly, the consumer will have to manually select "No" to ensure that the $4.99 expedited delivery is not automatically placed on the order.

63.     Once again, during this stage of the process, Defendant omits any information to alert a consumer that an additional charge will be added to the price of the product.

64.     Once the consumer spends considerable time and energy in the "Delivery Information Stage," they will click "Continue to Billing Info" in the bottom right corner. This will bring the consumer to the next stage in the From You Flowers Purchase Flow.

### 6.     Billing Information Stage:

65.     Clicking "Continue to Billing Info" will bring the consumer to the page pictured in Figure 6, Exhibit A.

66.     The consumer, when reading the page from left to right, will first be prompted to enter their "Billing Information." Here, the consumer is prompted to: (a) select an optional title for themselves, (b) enter their first name, (c) enter their last name, (d) enter their billing address, (e) optionally enter their apartment, floor, or suite, (f) enter their city, (g) enter their state, (h) enter their postal code, (i) enter their phone number and any optional extension, and (j) enter their email address. Just below this, the consumer is given the option to "save [their] order information for Express Checkout!," which would involve selecting a password, entering that password, and then again re-entering the password.

67.     Next, on the right-hand side of the screen, the consumer will be prompted to enter whether they would like to pay via card or via PayPal. If paying with a card, the consumer must enter their credit card number, (c) enter their CVV, (d) enter the expiration month of their card, (e) enter the expiration year of their card.

68.     Finally, the consumer will then be prompted to enter any "Gift Certificate Number" they may have to be applied to the order.

69.     Once all the above is inputted, the consumer will click "Review Order" on the bottom, right corner of their screen.

70.     As with all previous stages, during this stage of the process, Defendant omits any information to alert a consumer that additional charges may be added to the price of the product.

71.     Also, notably, at this point, the consumer has been prompted to enter their payment credentials. The consumer will understand this to be the moment where they take an action to assent to the offer of the initially listed price of $47.99 (plus applicable tax). The user is not expecting the actual outcome, that on the next page, Defendant will confront them with a large Surprise Fee for the first time. Defendant gives no indication that it will apply an individual Surprise Fee to each product in the consumer's shopping cart.

### 7.     Review Order Stage

72.     Once on the "Review Order" page, the user will be able to view the full details of the purchase for the first time, as seen in Figure 7, Exhibit A. Notably, the consumer is only brought to this page after they have entered their payment info. The consumer should reasonably expect a tax to be added to the order, but the added Surprise Fee (here, $14.99) is unexpected.

73.     Here, for the first time, Defendant discloses the "Delivery Fee" of $14.99 that is applied to the product and a "Sales Tax" to the customer of $6.80. For the first time, the true and full price of the order, $74.77 is shown (the sum of the merchandise price of $59.99, minus the automatic sitewide discount of $12.00, plus the "Delivery Fee" of $14.99, plus the Sales Tax of $6.30).

74.     If the user is viewing Defendant's site from a minimized window or is accessing the site from their phone, the Surprise Fee will not be visible until they have scrolled to the very bottom of the page. It is quite likely that the consumer will overlook anySurprise Fee applied to their transaction, as they will not know to look for it. Prior to this stage in the Purchase Flow, the consumer was given no indication that a Delivery Fee will be assessed per each product. The web page is designed in such a way that the user may not know to look for this charge and may instinctively hit the "place order" button prior to catching this sudden, drip price.

75.     Only after clicking through a series of ten pages and entering all the details associated with the order, will the consumer be presented with Defendant's drip-priced $14.99 Surprise Fee.

76.     As seen in Figure 7, Exhibit A, the $14.99 fee (i.e., Surprise Fee), the tax associated with the order, and the grand total of each of these sums are presented as totaling $69.28.

77.     Defendant's **"Surprise Fees"** are a hidden surcharge that surprises the consumer at the very last step of the check-out process, after they have spent significant time and energy attempting to transact at the "bait" price of $47.99. In the example in Exhibit A, Defendant charges a Surprise Fee of $14.99 per product, ostensibly for "delivery," though at times during the Class Period, Defendant charged other rates, often higher than $14.99. Defendant does not disclose this "delivery" fee, any sort of fee schedule, nor any other Surprise Fee, at any earlier stage.

78.     By presenting the Surprise Fee for the first time on the final stage of the Purchase Flow, after the consumer has completed the lengthy process and right before purchasing, the consumer is led to believe the Surprise Fee applied to each product is mandatory. Consumers who have invested time and energy into making the purchase and do not wish to re-start the process will feel forced into paying the Surprise Fee and buying the product at the higher-than-advertised price. But the Surprise Fee is typically optional; shortly after abandoning their cart, Defendant will use the email address that consumers provided during the Purchase Flow to send them a promotional email offering to waive the Surprise Fee if they complete their order.

79.     **Defendant does not disclose its fee policies in any conspicuous location.** Most retailers who assess shipping and delivery charges maintain a link on their home page where consumers can view the fees for shipping and delivery, to allow them to understand what they will be charged and what the circumstances are that will cause these costs to increase or decrease. In the absence of any obvious information or disclosures about fees for shipping and delivery, consumers will reasonably understand any price to be inclusive of the cost of shipping and delivery. And that belief will be reinforced when presented mid-way through purchase, when consumers are given an option to pay an additional fee to expedite the shipping, without simultaneously being provided information about the base shipping cost.

80.     While Defendant does publish limited information about its fees, the information is well-hidden and incomplete. Specifically, Defendant has a page on "Taxes and Pricing," on

Defendant's website, which describes a "service fee,"[33] which Defendant appears to use interchangeably with "delivery fee" as it appears in the final stage of the Purchase Flow. On that page, Defendant states "From You Flowers, LLC has a Service Fee for all orders. This service fee varies depending on product." [34] But not only does Defendant omit any information about the amounts of these fees, there is no way for a consumer to directly access the "Taxes and Pricing" page from Defendant's home page or any point during the Purchase Flow. Instead, consumers will only find this page if they scroll to the bottom of the home page, past several large graphics and bold text, and click on a link entitled "Company Information" (under "About Us"), and from there, they must then click on another link, labeled "Taxes &Pricing."

81. Defendant is similarly evasive on its Frequently Asked Questions page. There, in response to the question "What is your service fee for?", Defendant states, "Our service fee guarantees your 100% satisfaction and that your delivery will be made by one of our local preferred florists in your recipient's area."[35] Here, again, Defendant does not actually provide any information on the amount of these fees. Thus, even in the unlikely event a consumer had found either of these two webpages prior to beginning the process of completing an order, the consumer would still not know the true amount of Defendant's products and would have no reason to believe that any fee would be as high Defendant's Surprise Fees typically are.

82. **The "delivery fee" is not truly a "delivery fee" or a shipping cost.** These Surprise Fees are the hidden surcharge of every listed item, assessed on those consumers who do not abandon their carts when presented with the higher, seemingly mandatory Surprise Fee. It is not a "delivery" cost because it is not assessed based on delivery, but rather, based on whether Defendant can trick a consumer into actually paying it. In fact, Defendant is evasive about the

---

[33] *Taxes and Pricing*, FROMYOUFLOWERS.COM, https://www.fromyouflowers.com/pricing.htm (last visited Jan. 28, 2025).

[34] *Id.*

[35] *Frequently Asked Questions*, FROMYOUFLOWERS.COM, https://www.fromyouflowers.com/faq.htm#what-is-your-service-fee-for (last accessed Jan. 28, 2025).

CLASS ACTION COMPLAINT

nature of the fee on its websites. As demonstrated by Defendant's statements on the Taxes and Prices page and on the Frequently Asked Questions page, the fee is for general service, not a pass-through delivery charge. And Defendant's products are typically prepared and hand-delivered by Defendant's partners, who are paid both for preparing the floral arrangement and for delivering them. Thus, unlike many retail transactions, where the retailer stocks the product and uses a third-party shipper such as the Post Office or FedEx, and the consumer pays a pass-through shipping cost or some fee reasonably calibrated to align with the retailer's out of pocket costs, Defendant outsources everything – providing the product and delivering the product – to a single third party. Despite paying one entity to perform both services, Defendant partitions the consumer's cost into two parts. And while florists might vary in the price they charge to Defendant for both services, Defendant does not price the floral arrangements themselves off of the location. While the Surprise Fee varies based on the specific arrangement chosen, for any given arrangement, the same fee is applied, regardless of where the arrangement is being delivered. In other words, Defendant applies a $14.99 Surprise Fee to the Raspberries & Crème arrangement in Exhibit A, regardless of where that arrangement will be delivered, but for other arrangements, Defendant might assess a $15.99 Surprise Fee.  If a consumer orders two arrangements, two total Surprise Fees will be applied; for three arrangements, a consumer will be charged three Surprise Fees.

83.    In the example in Exhibit A, Defendant only intended to sell the flowers at the "bait" price of $47.99 to those consumers who walked away from the inflated price at the last minute – for everyone else, Defendant intended to try to overcharge them with high Surprise Fees. In this example, Defendant intended to sell a product at the entirely different price of $62.98 (plus sales tax) to those it could successfully trick. Though the prices fluctuate between different floral arrangements listed on Defendant's e-commerce site, each presents an opportunity for Defendant to try to extract a hidden surcharge.

84.    As detailed herein, this pricing scheme is an illegal bait-and-switch scheme designed to hassle the user into clicking "Place Order" rather than confront the alternative of losing more valuable time and energy searching for another option from a different competitor or a

differently priced listing from Defendant's offerings. Defendant bets on the consumer giving in the "sunken cost fallacy," as well as "anchoring" on the "bait" price of $47.99, knowing that its deceptive pricing tactic will hassle the consumer into clicking "Place Order." The consumer will be loath to undo the considerable time and effort they have expended thus far in the transaction.

85.     Moreover, the check-out process is designed such that it induces "decision fatigue" in the buyer, who has had to make a slew of approximately 15 decisions and perform various tasks during the purchase flow prior to being confronted with the Surprise Fee.

86.     Indeed, the risks of sunken cost fallacy and decision fatigue are high in the context of purchasing flowers. Many people who buy flowers from Defendant are doing so to send them to someone else as a gift or to send condolences. Given that, many consumers may need the product to arrive by a certain date and may not have time to continue shopping for cheaper options. And because many consumers are buying flowers to send to someone else, the Purchase Flow includes steps such as locating the recipient's address and writing an appropriate message, that add to the time it takes to place the order.

87.     After making the following series of choices, the consumer is likely to acquiesce to the charge, as this will require less cognitive effort than starting from scratch, which would require re-entering the marketplace, and initiating the purchase flow with a competitor:

(1) The consumer must select the desired arrangement from hundreds of listings;

(2) The consumer must select whether they would like the Regular, Deluxe, or Premium version of the desired arrangement;

(3) The consumer must evaluate whether they would like to add one to five Mylar balloons to the order, and if so, what category of balloon, whether Birthday, Anniversary, Congratulations, Get Well, Good Luck, I Love You, New Baby Boy, New Baby Girl, Thank You, or Thinking of You;

(4) The consumer must consider whether they would like to add a small, medium, or large box of chocolates, for an additional $15.00, $20.00, or $25.00, respectively;

CLASS ACTION COMPLAINT

(5) The consumer must determine whether they would like to add a small, medium, or large "Teddy Bear" to their purchase, for an additional $15.00, $20.00, or $25.00, respectively;

(6) The consumer must select a date for delivery, and decide whether they would like to pay an extra $2.99 to have the floral arrangement delivered on a "high traffic" day;

(7) The consumer select a card type from a drop-down menu for inclusion in the delivery, from fifteen options: Blank Card, No Card, Birthday, Sympathy, Funeral, Get Well, Valentine's Day, I Love You, Just Because, Thank You, Congratulations, Anniversary, Missing You, New Baby, or Other;

(8) The consumer must consider whether they would like to add a custom note to the delivery, and if so, what it should say; and they must take care to ensure the note is less than 175 characters;

(9) The consumer must weigh whether they would like to create an account with the wire service and, if so, what their password should be;

(10)   The consumer must decide which delivery address is most appropriate for their intended recipient, and locate that address;

(11)   The consumer must determine whether or not they would like to pay an additional $4.99 for delivery before 12 pm in the recipient's time zone;

(12)   The consumer must consider what method of payment they would like to bill the delivery to, whether that is a credit or debit card or whether they'd like instead to use PayPal to complete the transaction;

(15)   The consumer must consider whether they would like to input a promotional code or gift card number and apply this toward the purchase;

88.    In sum, Defendant confronts the consumer with the drip price of the amount of the Surprise Fee only after the user has: (a) anchored on the listed, lower "bait" price, (b) devoted considerable time, energy, and focus to the purchase flow which they will perceive as sunken cost,

and (c) have accumulated "decision fatigue" such that they would rather acquiesce to the default "drip" price rather than seek a competitor's product or a cheaper From You Flowers offering. It is only when a consumer fails to fall for Defendant's trickery does the consumer learn that the added fee was optional.

89.     In so doing, Defendant has misled class members around the country, tricking them into purchasing flowers using a low bait price, and then switching the price through drip pricing at the end.  In so doing, Defendant has been unjustly enriched by tens of millions (if not more) annually. Discovery will uncover the definite amount of revenue Defendant clears using this bait-and-switch scheme.

**C.    Other Companies Do Not Rely on Drip Pricing to Drive Their Sales**

90.     It is commercially viable for Defendant to cease their drip pricing scheme, as their competitor 1-800-Flowers.com, Inc. does not engage in this tactic. As pictured below, the 1-800-Flowers.com, Inc. list price for each item on their website includes the service fee. This is disclosed up front, during the "Browsing Stage." Each list price includes the disclaimer that the price "Includes service fee & delivery by a local florist." 1-800-Flowers.com, Inc. does not spring a sudden, drip price on consumer at any point during the consumer purchase flow.



*Screengrab of the 1-800-Flowers.com, Inc. website*

**D.**    **Defendant's Drip Pricing Runs Afoul of Federal and State Law**

91.    Defendant's drip pricing scheme is illegal as it is a form of bait-and-switch advertising, which has long been prohibited by the FTC and by many states through their statutory prohibitions on unfair and deceptive practices.

92.    FTC's Prohibition on Bait-and-Switch Schemes. With respect to bait-and-switch prohibitions, the FTC warns that "[n]o advertisement containing an offer to sell a product should be published when the offer is not a bona fide effort to sell the advertised product." 16 C.F.R. § 238.1 (2019). The FTC's guidance on bait-and-switch advertising states that "[n]o statement . . . should be used in any advertisement which creates a false impression of the . . . value . . . of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, the purchaser may be switched from the advertised product to another." 16 C.F.R. § 238.2(a).

93.    If the first contact with a consumer is secured by the deceptive bait advertisement (or a "bait price"), it is a violation of law even if the true facts are subsequently made known to the buyer. 16 C.F.R. § 238.2(b). Through drip and/or partitioned pricing, companies induce consumers to choose a product or service based on an advertised price (i.e., the "bait"), despite ultimately charging a different and higher price than advertised (the "switch").

94.    In spite of FTC's long prohibition on bait-and-switch advertising, Defendant lures consumers with an initial "bait," an insincere initial offer that Defendant has no intention of actually selling the floral delivery for. Instead, only after the consumer expends time and energy, and manifests intent to contract for a floral delivery at the initial price, are they then confronted with the much higher, total cost (the "bait" price plus the "switch," or drip price.)

95.    FTC Guidance on Online Advertising and Sales. Additionally, Defendant's drip pricing scheme does not comport with FTC guidance on online advertising and sales, further demonstrating that Defendant's pricing practice is deceptive and unfair.

96.     In its 2013 publication ".com Disclosures: How to Make Effective Disclosures in Digital Advertising,"[36] the FTC makes clear that when advertising and selling are combined on a website or mobile application, and the consumer will be completing the transaction online, disclosures should be provided before the consumer makes the decision to buy—for example, before the consumer "add[s] to shopping cart."

97.     In Defendant's case, according to this guidance, the additional Surprise Fee should be disclosed before the customer has to click "Add to Cart." Instead, the fees are not disclosed until the very end of the transaction, after the customer has already provided his or her credit card information and made the decision to buy.

98.     The FTC also states that required disclosures must be clear and conspicuous. Defendant does not disclose its additional fees in a clear or conspicuous manner. Instead, it hides fees from consumers until the very end of the transaction, displaying them alongside the "BOUQUET(S)" and "TAX" entries.

### E.     California Prohibits Bait-and-Switch Pricing and Drip Pricing Schemes

99.     California law has long prohibited bait-and-switch pricing. *See, e.g., Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1021 n.13 (9th Cir. 2011) ("One might even say that, in effect, California has created what amounts to a conclusive presumption that when a defendant puts out tainted bait and a person sees it and bites, the defendant has caused an injury; restitution is the remedy."); *Veera v. Banana Republic, LLC*, 6 Cal. App. 5th 907, 918 (2016) (holding that California's Unfair Competition Law, False Advertising Law, and Consumer Legal Remedies Act "are designed in part to protect consumers such as plaintiffs by requiring businesses to disclose the actual prices of items offered for sale, and prohibiting businesses from using false and deceptive advertising to lure consumers to shop").

---

[36] *.com Disclosures: How to Make Effective Disclosures in Digital Advertising*, FED. TRADE COMM'N (March 2013), https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-staff-revises-online-advertising-disclosure-guidelines/130312dotcomdisclosures.pdf.

CLASS ACTION COMPLAINT

100.    In addition, California has recently gone one step further, adding additional express prohibitions on drip pricing to better protect consumers.  Specifically, on July 1, 2024, California Senate Bill 478 went into effect, prohibiting drip pricing. California Senate Bill No. 478, S.B. 478, 2023-2024 Leg., Reg. Sess. (Cal. 2023).

101.    The California legislature specified that SB 478 "is intended to specifically prohibit drip pricing, which involves advertising a price that is less than the actual price that a consumer will have to pay for a good or service." The legislature also clarified that this amendment is not meant to promulgate an entirely new rule, but instead that, "this practice [drip pricing], like other forms of bait and switch advertising, is prohibited by existing statutes, including the Unfair Competition Law (Chapter 5 (commencing with Section 17200) of Part 2 of Division 7 of the Business and Professions Code) and the False Advertising Law (Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code)." The language of the Bill clarified that "drip pricing" is a form of "bait and switch" advertising, guiding the courts to consider this new pricing trend a violation of existing FTC rules.

102.    Amended by SB 478, Cal. Civ. Code § 1770 lists as unlawful: "Advertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges other than either of the following: (i) Taxes or fees imposed by a government on the transaction[;] (ii)  Postage or carriage charges that will be reasonably and actually incurred to ship the physical good to the consumer."

103.    When formulating the bill's parameters, and choosing to exclude postage or carriage fees, the legislature was presented the following opposition's concerns: "shipping costs vary based on the size of the item, expediency of the shipping options, and geographic locations. Shipping might technically be mandatory when purchasing an online product, and therefore would fall within the bill's scope, but the variability described does not lend itself to the 'all-in' advertised price mandate of SB 478."[37]

---

[37] *Consumers Legal Remedies Act: Advertisements: SB 478 (Dodd) – As Amended May 18, 2023: Synopsis of Hearing Before the Comm. on Judiciary*, 2023-24 Ca. State Assembly (2023).

104.    For this reason, the legislature carved out an exception for these types of fees, as long as they are reasonably and actually incurred. As detailed in the legislative history for SB 478, "The qualifier 'will be reasonably and actually incurred' is critical to the functioning of this amendment." Assembly Committee on Privacy and Consumer Protection, Jesse Gabriel, Chair, SB 478 (Dodd)- As Amended May 18th, 2023 (Date of Hearing: July 11, 2023). The qualifier "will be reasonably and actually incurred" "is meant to ensure that later-disclosed shipping charges reflect the actual cost of shipping the product. Without this qualifier, this exemption might open a loophole for new junk fees. An online retailer might lure a shopper in (particularly if the shopper relies on third-party websites allowing price comparison) by showing a product at a price much lower than any of its competitors, and then, just before payment, display an inflated shipping charge that brings the total cost to buy the product in line with the retailer's competitors. This would be a new form of junk fee, but because of the phrase "will be reasonably and actually incurred," this practice would be prohibited under this amendment." *Id.*

105.    Though a business can exclude reasonably and actually incurred shipping charges from its advertised price, it cannot exclude "handling charges." "Like any other mandatory fee or charge, a handling charge must be included in the advertised price."[38] Additionally, a company may not exclude a "delivery fee" that is not "reasonably and actually incurred."

**F.    Many Other States Prohibit Bait and Switch Advertising and Drip Pricing Schemes**

106.    First, when considering whether a practice is deceptive or unfair, many states' statutes expressly require courts to look to the FTC for guidance on what constitutes deceptive and unfair conduct. See, e.g., Mass. Ann. Laws ch. 93A, § 2(b); Fla. Stat. Ann. § 501.204(b); 815 Ill. Comp. Stat. Ann. 505/2. Thus, because the practice violates FTC rules, it also violates many state laws.

---

[38] *SB 478, Hidden Fees,* Rob Bonta, Attorney General, https://oag.ca.gov/hiddenfees# (last accessed Jan. 5, 2025).

107.    In addition, many states' unfair and deceptive practices statutes have been interpreted to prohibit drip pricing and other forms of bait-and-switch advertising. See, e.g., *Luca v. Wyndham Worldwide Corp.*, No. 2:16-cv-00746, 2019 WL 211098 (W.D. Penn. Jan. 16, 2019); *Pecznick v. Amazon.com, Inc.*, No. 2:22-cv-00743-TL, No. 2:22-cv-00783-TL, 2022 WL 4483123 (W.D. Wash. Sept. 27, 2022).

### G.    Plaintiffs' Claims

108.    **Plaintiff Trevor Walterlakes** has used From You Flowers to purchase the delivery of a floral arrangement on at least one occasion.

109.    On Thursday, August 22, 2024, Plaintiff Walterlakes searched for a gift basket to deliver to a friend for her birthday. After scanning through Defendant's offerings using Defendant's website, he identified Defendant's Beary Happy Birthday Snack Basket. The item was listed at the price of $64.99. Plaintiff Walterlakes expected to pay this sum, plus applicable tax.

110.    Plaintiff Walterlakes clicked on the item, which brought him to Defendant's Beary Happy Birthday Snack Basket Product Page. He selected the "Regular" size of the gift basket.

111.    Plaintiff Walterlakes then entered his friend's zip code of 91355 on Defendant's Beary Happy Birthday Snack Basket Product Page. The Product Page did not indicate that the $64.99 was merely a base price and that Defendant would add an additional, Surprise Fee to the purchase. Relying on the listed price, Plaintiff Walterlakes then selected a delivery date of November 6, 2024. Plaintiff Walterlakes then opted to include a card in the order and wrote a custom message to be included in the delivery.

112.    Plaintiff Walterlakes clicked "Add to Cart" to start the transaction. Plaintiff Walterlakes was then taken to his From You Flowers "Shopping Cart." On this page, Plaintiff Walterlakes was shown a subtotal for his order, but this subtotal did not include tax nor the Surprise Fee that Plaintiff Walterlakes would need to pay in order to secure the delivery. Due to the omission on the "Shopping Cart" page of the Surprise Fee, Plaintiff Walterlakes was not expecting to be charged an additional $14.99.

113.    Next, Plaintiff Walterlakes clicked "Continue to Secure Checkout." This brought Plaintiff Walterlakes to the "Login, Create Account, or Guest Checkout" Stage, where he declined to create an account with Defendant. Plaintiff Walterlakes clicked "Continue as Guest."

114.    This brought Plaintiff Walterlakes to the "Delivery Information" stage in the Purchase Flow. This stage required that Plaintiff Walterlakes spend considerable time and energy. First, Plaintiff Walterlakes entered the recipient's first and last name; the delivery address, city, state, zip code, country, and address type; and the recipient's phone number. Then, Plaintiff Walterlakes declined the "Morning Delivery Option" which would have ensured the delivery would occur prior to 12 pm on the delivery date, for an added expedited shipping fee of $4.99.

115.    At no point during the "Delivery Information" Stage in the Purchase Flow did Defendant indicate to Plaintiff Walterlakes that there would be a Surprise Fee added to his order. After entering all the required delivery information, Plaintiff Walterlakes clicked "Continue to Billing Info."

116.    Next, Plaintiff Walterlakes was prompted to enter his billing information, including his title; first name; last name; billing address; billing city, state, and postal code; his phone number; and his email address. He was then prompted to generate a From You Flowers account and save his payment information for future express checkout, which he declined to do. Next, Plaintiff Walterlakes entered his payment details. He was prompted to enter a gift certificate and declined to do so. After completing all the required steps in the "Billing Information" stage, Plaintiff Walterlakes expected to be charged for the merchandise and any applicable tax. There was no indication during the "Billing Information" stage that he would be subjected to any additional fees.

117.    Only after Plaintiff Walterlakes entered his payment details, clicked "Review Order," and was taken to the "Review Order" page, was he finally presented with the Surprise Fee of $14.99.

118.    At this point, Plaintiff Walterlakes gave in to the fee, despite his frustration. Plaintiff Walterlakes had already expended considerable time and energy, and assumed that because

Defendant is a major company, that all other flower wire services would engage in the same conduct. Thus, Plaintiff Walterlakes gave in to the Surprise Fee. He had invested a lot of time in this purchase and did not wish to risk investing even more time finding another gift basket, particularly given the risk that other vendors might also subject him to Surprise Fees, causing him to waste even more time. He did not know that if he abandoned his cart, Defendant may have emailed him with an offer to waive the Surprise Fee. When Plaintiff Walterlakes began browsing Defendant's website and throughout the course of navigating the Purchase Flow, he was led to believe that his purchase would be around $64.99 for the merchandise, plus any applicable tax. However, at the last possible moment in the checkout process, he discovered that his order would be significantly more due to the Surprise Fee of $14.99.

119.    Had Defendant priced the bouquet with full transparency, listing the true and full price of the bouquet, Plaintiff Walterlakes would have either abstained from purchasing the gift basket, or would have chosen to pay less for an alternative product.

120.    **Plaintiff Kimberley Mahabal** has used From You Flowers to purchase the delivery of a floral arrangement on at least one occasion.

121.    On Wednesday, September 4, 2024, Plaintiff Mahabal searched for a floral arrangement to deliver to a funeral home for use in her father's funeral. After scanning through Defendant's offerings using Defendant's website, she identified Defendant's Heartfelt Serenity Funeral Spray. The item was listed at the price of $179.99. Plaintiff Mahabal expected to pay this sum, plus applicable tax.

122.    Plaintiff Mahabal clicked on the item, which brought her to Defendant's Heartfelt Serenity Funeral Spray Product Page. She selected the "Deluxe" size of the bouquet. Plaintiff Mahabal opted to "Make it Special" by adding a "Sympathy Banner" for an additional $5.00, indicating that it should read "Beloved Dad."

123.    Plaintiff Mahabal then entered the funeral home zip code of 11420 on Defendant's Heartfelt Serenity Funeral Spray Product Page. The Product Page did not indicate that the $179.99 was merely a base price and that Defendant would add any Surprise Fees, such as an additional,

"delivery fee" to the purchase. Relying on the listed price, Plaintiff Mahabal then selected a delivery date of Friday, September 6, 2024. Plaintiff Mahabal then abstained from adding a card message to the order.

124.    Plaintiff Mahabal clicked "Add to Cart" to start the transaction. Plaintiff Mahabal was then taken to her From You Flowers "Shopping Cart." On this page, Plaintiff Mahabal was shown a subtotal for her order, but this subtotal did not include tax nor the Surprise Fee that Plaintiff Mahabal would need to pay in order to secure the delivery. Due to the omission on the "Shopping Cart" page of the Surprise Fee, Plaintiff Mahabal was not expecting to be charged an $18.99 Surprise Fee.

125.    Next, Plaintiff Mahabal clicked "Continue to Secure Checkout." This brought Plaintiff Mahabal to the "Login, Create Account, or Guest Checkout" Stage, where she declined to create an account with From You Flowers. Plaintiff Mahabal clicked "Continue as Guest."

126.    This brought Plaintiff Mahabal to the "Delivery Information" stage in the Purchase Flow. This stage required that Plaintiff Mahabal spend considerable time and energy. First, Plaintiff Mahabal entered the recipient's first and last name; the delivery address, city, state, zip code, country, and address type; and the recipient's phone number. Then, Plaintiff Mahabal selected the "Morning Delivery Option" to ensure the delivery would occur to the funeral home prior to 12 pm, for the expedited shipping fee of $4.99.

127.    At no point during the "Delivery Information" Stage in the Purchase Flow did Defendant indicate to Plaintiff Mahabal that there would be a Surprise Fee added to her order. After entering all the required delivery information, Plaintiff Mahabal clicked "Continue to Billing Info."

128.    Next, Plaintiff Mahabal was prompted to enter her billing information, including her title; first name; last name; billing address; billing city, state, and postal code; her phone number; and her email address. She was then prompted to generate a From You Flowers account and save her payment information for future express checkout, which she declined to do. Next, Plaintiff Mahabal entered her payment details. She was prompted to enter a gift certificate, and

declined to do so. After completing all the required steps in the "Billing Information" stage, Plaintiff Mahabal expected to be charged for the merchandise, sympathy banner, and the expedited shipping. There was no indication during the "Billing Information" stage that she would be subjected to an additional Surprise Fee.

129.    Only after Plaintiff Mahabal entered her payment details, clicked "Review Order," and was taken to the "Review Order" page, was she finally presented with the Surprise Fee of $18.99.

130.    At this point, Plaintiff Mahabal gave in to the fee, despite her frustration. Plaintiff Mahabal was under time pressure to get the floral arrangement to her father's funeral, and she was overwhelmed with the process of planning this occasion. Due to the intense situation she was in, and the time sensitive nature of her order, Plaintiff Mahabal felt that it would take too much time and energy to identify an alternative floral display.  She did not know that if she abandoned her cart, Defendant may have emailed her with an offer to waive the Surprise Fee. Had she known that she would be saddled with the Surprise Fee, Plaintiff Mahabal would have looked elsewhere for a floral arrangement for her father's funeral. Had Defendant priced the bouquet with full transparency, listing the true and full price of the bouquet, Plaintiff Mahabal would have declined the purchase altogether, or would have identified a lower cost alternative.

## VI.    CLASS ALLEGATIONS

131.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

132.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring this action individually and on behalf of the following Class and Subclass:

133.    Class: All individuals in the United States who purchased a floral arrangement and/or other gift delivery from Defendant within the applicable statute of limitations

> **Class:** All individuals in the United States who purchased a
> floral arrangement and/or other gift delivery from Teleflora
> within the applicable statute of limitations

**California Subclass:** All class members who resided in California at the time of their purchase.

**New York Subclass:** All class members who resided in New York at the time of their purchase.

134.    Plaintiff Walterlakes represents, and is a member of, this Class and the California Subclass.

135.    Plaintiff Mahabal represents, and is a member of, this Class and the New York Subclass.

136.    Excluded from the Class are the Defendant, and any entities in which the Defendant has a controlling interest, the Defendant's employees, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family, as well as claims for personal injury or wrongful death.

137.    Plaintiffs reserve the right to amend or modify the Class and Subclass definitions after having an opportunity to conduct discovery.

138.    The Class and Subclass meet the criteria for certification under Rule 23(a), (b)(2), (b)(3), and (c)(4). Plaintiffs and all members of the Class have been harmed by the acts of the Defendant. Class-wide adjudication of Plaintiffs' claims is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

139.    **Numerosity. Fed. R. Civ. P 23(a)(1).** The members of the Class and Subclass are so numerous that individual joinder of all class members is impracticable. Although the exact number of members is unknown at this time, it can readily be determined from the internal business records of Defendant, and Class members may be notified of the pendency of this action by published and/or mail/emailed notice. Plaintiffs reasonably estimate that there are hundreds of thousands of members of the Class.

140.    **Commonality and Predominance. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Common questions of law and fact exist as to all members of the putative class that will drive the litigation

and predominate over any questions affecting only individual Class members. Common questions include, but are not limited to:

    a)  Whether Defendant's pricing practices were and are likely to mislead consumers;

    b)  Whether Defendant's representations in the floral delivery prices displayed on Defendant's website were and are misleading;

    c)  Whether Defendant knew or should have known that its pricing practices were and are likely to mislead consumers;

    d)  Whether Defendant knew or should have known that the floral delivery prices displayed on Defendant's website were and are false and/or misleading;

    e)  Whether the facts Defendant failed and continued to fail to disclose in Defendant's advertising were and are material;

    f)  Whether Defendant's acts alleged herein were unlawful;

    g)  Whether consumers suffered and continue to suffer damage as a result of Defendant's acts alleged herein;

    h)  The extent of the damage suffered by consumers as a result of Defendant's acts alleged herein;

    i)  Whether Defendant's acts alleged herein were and are unfair;

    j)  Whether Defendant should be enjoined from continuing to advertise as alleged herein;

    k)  Whether Defendant has been unjustly enriched;

    l)  Whether Plaintiffs and the Class members are entitled to damages and restitution, including for the value of the purchase price, and the proper measure of Plaintiffs' and the Class Members' losses.

    141.  **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative Class member and are based on the same facts and legal theories as each of the Class members. Plaintiffs, like all members of the Class, purchased one of Defendant's Floral

Arrangements from Defendant's website. Plaintiffs, like all Class members, were thus subject to Defendant's bait-and-switch pricing scheme. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class.

142.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative Class and Subclass because their interests coincide with, and are not antagonistic to, the interests of the members of the Class that they seek to represent. Plaintiffs have retained counsel competent and highly experienced in complex consumer class action litigation, who intend to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Class.

143.    **Superiority. Fed. R. Civ. P. 23(b)(3)**. Questions of law and fact common to the Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof. Plaintiffs are not aware of any other current pending litigation against Defendant to which any Class member is a party involving the subject matter of this suit, and the Action presents no difficulties that will impede its management by the Court as a class action.

144.    **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendant has acted on grounds generally applicable to the entire Class, thereby making appropriate injunctive relief and/or corresponding declaratory relief

with respect to Plaintiffs and putative Class members. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that could establish incompatible standards of conduct for Defendant. Injunctive relief is necessary to prevent further fraudulent and unfair business practices by Defendant including Defendant's continued use of private consumer data collected from consumers without the exchange of consideration, as well as the potential that Defendant will redesign their website so that all floral arrangement listings initially advertise the entire price that will ultimately be charged for the floral delivery, exclusive of taxes or reasonably incurred shipping charges.

## VII.    <u>CLAIMS FOR RELIEF</u>

145.    Based on the foregoing allegations, Plaintiffs' claims for relief include the following:

**<u>COUNT I</u>**
**Violations of the Consumer Protection Acts of 50 States**
*(On Behalf of all Plaintiffs and the Class)*

146.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

147.    On behalf of the Class, Plaintiffs bring these statutory consumer protection claims pursuant to the substantially similar "Consumer Protection Acts" identified below, all of which were enacted and designed to protect consumers against unlawful, fraudulent, and/or unfair business acts and practices.

148.    Together with the violations of California's CLRA (Count II), California's False Advertising Law (Count III), California's Unfair Competition Law (Count IV), New York's Deceptive Acts and Unfair Trade Practices Act (Count V); New York's False Advertising Act (Count VI), the following consumer protection acts are collectively referred to herein as the "Consumer Protection Acts":

1)    ALA. CODE § 8-19-1 et seq. (Alabama);

2)  ALASKA STAT. ANN. § 45.50.471 et seq. (Alaska);

3)  ARIZ. REV. STAT. ANN. § 44-1521 et seq. (Arizona);

4)  ARK. CODE ANN. § 4-88-101 et seq. (Arkansas);

5)  COLO. REV. STAT. ANN. § 6-1-101 et seq. (Colorado);

6)  CONN. GEN. STAT. ANN. § 42-110a et seq. (Connecticut);

7)  DEL. CODE ANN. tit. 6, § 2511 et seq. (Delaware);

8)  D.C. CODE ANN. § 28-3901 et seq. (District of Columbia);

9)  FLA. STAT. ANN. § 501.201 et seq.; FLA. STAT. ANN. § 817.06 and §§ 817.41 et seq. (Florida);

10) GA. CODE ANN. § 10-1-370 et seq. and GA. CODE ANN. § 101-390 et seq. (Georgia);

11) HAW. REV. STAT. ANN. § 480-1 et seq. and HAW. REV. STAT. ANN. § 481A-1 et seq. (Hawaii);

12) IDAHO CODE ANN. § 48-601 et seq. (Idaho);

13) 815 ILCS 505/1 et seq.; 815 ILCS §§ 510/1-510/7 (Illinois);

14) IND. CODE ANN. § 24-5-0.5-1 et seq. (Indiana);

15) IOWA CODE 714H.1, et seq. (Iowa);

16) KAN. STAT. ANN. § 50-623 et seq. (Kansas);

17) KY. REV. STAT. ANN. § 367.110 et seq. (Kentucky);

18) LA. STAT. ANN. § 51:1401 et seq. (Louisiana);

19) ME. REV. STAT. tit. 5, § 205-A et seq.; 10 M.R.S.A. §§ 1211-1216 (Maine);

20) MD. CODE ANN., COM. LAW § 13-101 et seq. (Maryland);

21) MASS. GEN. LAWS Ch. 93A §2 et seq. (Massachusetts)

22) MICH. COMP. LAWS ANN. § 445.901 et seq. (Michigan);

23) MINN. STAT. ANN. § 325F.68 et seq., MINN. STAT. ANN. § 325D.09 et seq., MINN. STAT. ANN. § 325D.43 et seq., and MINN. STAT. ANN. § 325F.67 (Minnesota);

CLASS ACTION COMPLAINT

24) MISS. CODE ANN. § 75-24-1 et seq. (Mississippi);

25) MO. ANN. STAT. § 407.010 et seq. (Missouri);

26) MONT. CODE ANN. § 30-14-101 et seq. (Montana);

27) NEB. REV. STAT. ANN. § 59-1601 et seq.; NEB. REV. STAT. ANN. § 87-301
through 87-306 (Nebraska);

28) NEV. REV. STAT. ANN. § 41.600 and NEV. REV. STAT. ANN. §598.0903 et
seq. (Nevada);

29) N.H. REV. STAT. ANN. § 358-A:1 et seq. (New Hampshire);

30) N.J. STAT. ANN. § 56:8-1 et seq. (New Jersey);

31) N.M. STAT. ANN. § 57-12-1 et seq. (New Mexico);

32) N.C. GEN. STAT. ANN. § 75-1 et seq. (North Carolina);

33) N.D. CENT. CODE ANN. § 51-15-01 et seq.; N.D. CENT. CODE ANN. § 51-
12-08 (North Dakota);

34) OHIO REV. CODE ANN. § 1345.01 et seq.; OHIO REV. CODE ANN. §
4165.01 et seq. (Ohio);

35) OKLA. STAT. ANN. tit. 15, § 751 et seq.; OKLA. STAT. ANN. tit. 78 § 51 et
seq. (Oklahoma);

36) OR. REV. STAT. ANN. § 646.605 et seq. (Oregon);

37) 73 PA. STAT. ANN. § 201-1 et seq. (Pennsylvania);

38) R.I. GEN. LAWS ANN. § 6-13.1-1 et seq. (Rhode Island);

39) S.C. CODE ANN. § 39-5-10 et seq. (South Carolina);

40) S.D. CODIFIED LAWS § 37-24-1 et seq. (South Dakota);

41) TENN. CODE ANN. § 47-18-101 et seq. (Tennessee);

42) TEX. BUS. & COMM. CODE §§ 17.41-17.63 (Texas);

43) UTAH CODE ANN. § 13-11-1 et seq. (Utah);

44) VT. STAT. ANN. tit. 9, § 2451 et seq. (Vermont);

45) VA. CODE ANN. § 59.1-196 et seq. (Virginia);

46) WASH. REV. CODE ANN. § 19.86.010 et seq. (Washington);

47) W.VA. CODE ANN. § 46A-6-101 et seq. (West Virginia);

48) WIS. STAT. ANN. § 100.18; WIS. STAT. ANN. § 100.20 (Wisconsin); and

49) WYO. STAT. ANN. § 40-12-101 et seq. (Wyoming).

149.    Plaintiffs and the Class members have standing to assert claims under the above-listed Consumer Protection Acts because they are consumers within the meaning of the Consumer Protection Acts; the floral arrangements were purchased for personal and household use and are consumer transactions; and Defendant's practices were addressed to the market generally and otherwise implicate consumer protection concerns. At all relevant times, Defendant conducted "trade" and "commerce" within the meaning of the Consumer Protection Acts.

150.    Defendant has committed fraudulent, deceptive and/or unfair business acts and practices by engaging in the acts and practices alleged herein. These actions had the capacity to, were likely to, and did in fact, mislead consumers into purchasing the floral arrangement deliveries at higher than advertised prices.

151.    Plaintiffs reiterate the specific circumstances surrounding Defendant's deceptive, fraudulent, and unfair business acts, including their advertising:

a) ***Who:*** Defendant made (or caused to be made) the material misrepresentations and omissions described herein. From a date unknown to the present, Defendant directed and controlled the marketing for each of its floral arrangements and made these representations and omissions. Since the creation of Defendant's website, www.fromyouflowers.com, Defendant has directed and controlled the marketing for the floral arrangements, directly through its website, and/or assumed responsibility for actions and representations it has made on its website.

b) ***What:*** Defendant's long-term, common false advertising scheme has misled consumers about Defendant's Surprise Fees, and the impact those Fees have on the prices they pay for Defendant's floral arrangements. Defendant's long-term,

CLASS ACTION COMPLAINT

coordinated scheme was comprised of material misrepresentations, false statements of fact, and omissions, which appear on Defendant's website, and are introduced, reiterated and reinforced in Google search results, and include misrepresentations, falsehoods, and omissions that are designed to lead consumers to believe that the floral arrangements are cheaper than they will actually cost. In particular, the practices that violate the Consumer Protection Acts include those detailed in Paragraphs 41–89 generally as to the Class, as well as Paragraphs 108–19 specifically as to Plaintiff Walterlakes and Paragraphs 120-30 specifically as to Plaintiff Mahabal. In particular, throughout the Class Period, Defendant's used an intentionally lengthy and confusing Purchase Flow to obscure the true cost of the floral arrangements to trick Plaintiffs and the Class into paying a higher than advertised price, including but not limited to the design of the Purchase Flow with the following deceptive patterns:

i.    During the first several stages of the Purchase Flow, including the Browsing Stage (Paragraphs 41–44), the Product Attribute Selection Stage (Paragraphs 45–52), the Purchase Initiation Stage (Paragraphs 53-56), the Login, Create Account, or Guest Checkout Stage (Paragraphs 57–58), the Delivery Information Stage (59–64), and the Billing Information Stage (65–71), Defendant displayed a partial cost for the products without any qualifier or warning to consumers of the Surprise Fees that would be added before purchasing;

ii.    During the first several stages of the Purchase Flow, including the Browsing Stage (Paragraphs 41–44), the Product Attribute Selection Stage (Paragraphs 45–52), the Purchase Initiation Stage (Paragraphs 53-56), the Login, Create Account, or Guest Checkout Stage (Paragraphs 57–58), the Delivery Information Stage (59–64), and the Billing Information Stage

CLASS ACTION COMPLAINT

(65–71), Defendant omitted any reference to its policies on fees, including any Surprise Fees;

iii.  Throughout the Purchase Flow, at various stages before the final stage in which Defendant first disclosed the Surprise Fees and displayed the full price of the product in an inconspicuous way, Defendant included additional tasks and choices to overburden consumers, increase decision-fatigue and their sunk costs, such as prompting consumers to add optional add-on merchandise, as well as prompting for payment and drafting notes to the recipient.

c) **Where:** The false advertising occurred on Defendant's website, www.fromyouflowers.com, as well as in Google search results. And the false advertising scheme was transmitted, distributed, displayed, and occurred to Class members residing throughout the country, including California; and displayed to Plaintiff Walterlakes in California, and Plaintiff Mahabal in New York, on Defendant's website.

d) **When:** Upon information and belief, Defendant engaged in the false advertising continuously during the Class Period, and continues to do so. Plaintiff Walterlakes encountered the representations and omissions described herein on the date of his purchase on August 8, 2024. Plaintiff Mahabal encountered the representations and omissions described herein on the date of her purchase on September 4, 2024.

e) **Why:** Defendant engaged in the material misrepresentations, false statements of fact, and omissions described herein with the intent to induce Plaintiffs and the Class to rely upon them in purchasing Defendant's floral arrangements.

152.    As a result of Defendant's unfair and deceptive acts, omissions, and misrepresentations, Plaintiffs, the Class, and Subclasses were unfairly and deceptively led to purchase the floral arrangements at a price higher than originally listed.

CLASS ACTION COMPLAINT

153.     Defendant's unfair and deceptive acts, omissions, and misrepresentations injured Plaintiffs, the Class, and the Subclasses. As a result of Defendant's violations Plaintiff Walterlakes and the members of the California Subclass and Plaintiff Mahabal and the members of the New York Subclass suffered ascertainable monetary losses in the form of the full purchase price of the products purchased from Defendant, or at a minimum, the Surprise Fees that were not disclosed until later stages in the Purchase Flow, which they would not have incurred but for Defendant's unlawful practices.

154.     Defendant knew and intended that Plaintiffs, the Class, and Subclasses would be deceived and rely on the deceptive, fraudulent, and unfair business acts and practices alleged herein.

155.     Defendant's actions, which were willful and wanton, constitute intentional violations of the Consumer Protection Acts.

156.     Defendant's deceptive, fraudulent, and/or unfair business acts and practices described herein are continuing in nature. Plaintiffs and the members of the Class and Subclasses have been damaged as a proximate result of Defendant's course of conduct and their violations of the Consumer Protection Acts for all of the reasons set forth above.

157.     Plaintiffs, the Class, and Subclasses members respectfully request damages, equitable monetary relief, injunctive relief, declaratory relief, and attorneys' fees, costs, and expenses to be assessed against Defendant, within the limits set forth by applicable law.

**COUNT II**
**Violation of California Consumers Legal Remedies Act,**
**California Civil Code § 1750,** *et seq.*
*(On Behalf of Plaintiff Walterlakes and the California Subclass)*

158.     Plaintiff Walterlakes repeats and re-alleges the allegations of the previous paragraphs and incorporates the same as if set forth herein at length.

159.     Plaintiff Walterlakes brings this cause of action pursuant to Civil Code Section 1750, et seq., the Consumers Legal Remedies Act ("CLRA"), on her own behalf and on behalf of all other persons similarly situated.

160.    At all relevant times, Plaintiff Walterlakes was a "consumer" as defined by California Civil Code section 1761(d).

161.    At all relevant times, Defendant's floral arrangements constituted "goods" as defined by California Civil Code section 1761(a).

162.    At all relevant times, Defendant constituted a "person" as defined by California Civil Code section l 76l(c).

163.    At all relevant times, Plaintiff Walterlakes and each of the class member's purchases of Defendant's goods constituted a "transaction" as defined by California Civil Code section 1761(e).

164.    The CLRA provides that it is unlawful to:

   a)   advertise goods or services with the intent not to sell them as advertised, § 1770(a)(9);

   b)   advertise, display, or offer a price for a good or service that does not include all mandatory fees or charges other than either (a) taxes or fees imposed by a government on the transaction, or (b) postage or carriage charges that will be reasonably and actually incurred to ship the physical good to the consumer, § 1770(a)(29);

   c)   represent that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law. §1770(a)(14).

165.    The practices engaged in by Defendant that violate the CLRA include those detailed in Paragraphs 41–89 generally as to the California subclass, as well as Paragraphs 108–19 specifically as to Plaintiff Walterlakes.  In particular, throughout the Class Period, Defendant engaged in the specific circumstances set forth in Paragraph 151 to unfairly and deceptively lead Plaintiff Walterlakes and the California Subclass into paying a higher than advertised price for floral arrangements. As a result of Defendant's violations, Plaintiff Walterlakes and the members of the California Subclass suffered ascertainable monetary losses in the form of the full purchase price of the products purchased from Defendant, or at a minimum, the Surprise Fees that were not

disclosed until later stages in the Purchase Flow, which they would not have incurred but for Defendant's unlawful practices.

166.    CLRA § 1782 NOTICE. Irrespective of any representations to the contrary in this Class Action Complaint, Plaintiff Walterlakes specifically disclaims, at this time, any request for damages under any provision of the CLRA. Pursuant to Civil Code § 1782, on January 29, 2025, the date of the filing of this Complaint, Plaintiff Walterlakes is sending via certified mail, return receipt requested, a written notice to Defendant's principal places of business, setting forth the particular violations of § 1770. In that letter, Plaintiff Walterlakes's demand that Defendant rectify the actions described above by providing monetary relief, agreeing to be bound by its legal obligations, and giving notice to all affected customers of their intent to do so within thirty (30) days. Defendant's failure to do so will result in Plaintiff Walterlakes amending this Class Action Complaint to seek, pursuant to California Civil Code § 1780(a)(3), on behalf of himself and those similarly situated class members, compensatory damages, punitive damages and restitution of any ill-gotten gains due to Defendants' acts and practices.

167.    Pursuant to Section 1780(a) of the CLRA, Plaintiff Walterlakes seeks all equitable remedies as the Court may award, including restitution, and injunctive relief in the form of an order enjoining the above-described wrongful acts and practices of Defendant, including, but not limited to, an order enjoining Defendant from continuing to engage, use, or employ its practice of unfair, deceptive, and unlawful advertising of its floral arrangementss, including an order of this Court enjoining Defendant from continuing to engage, use, or employ its unfair practice of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements and to require Defendant to cease charging any Surprise Fees that are not conspicuously disclosed at the preliminary stages of the Purchase Flow. Plaintiff Walterlakes shall be irreparably harmed if such an order is not granted.

/ / /

/ / /

/ / /

### COUNT III
**Violation of California False Advertising Law**
**Business & Professions Code § 17500, *et seq.***
***(On Behalf of Plaintiff Walterlakes and the California Subclass)***

168.    Plaintiff Walterlakes repeats and re-alleges the allegations set forth in the preceding paragraphs and incorporates the same as if set forth herein at length. Defendant's business acts and practices violate California Business and Professions Code section 17500. The practices engaged in by Defendant that violate the FAL include those detailed in Paragraphs 41–89 generally as to the California subclass, as well as Paragraphs 108–19 specifically as to Plaintiff Walterlakes. In particular, throughout the Class Period, Defendant engaged in the specific circumstances set forth in Paragraph 151 to unfairly and deceptively lead Plaintiff Walterlakes and the California Subclass into paying a higher than advertised price for floral arrangements.

169.    Defendant acted knowingly, recklessly, and in conscious disregard of the true facts in perpetuating its deceptive advertising scheme and causing injuries to Plaintiff Walterlakes and the Class.

170.    Plaintiff Walterlakes and the California Subclass have suffered injury in fact and have lost money as a result of Defendant's unfair, fraudulent, and unlawful conduct. Plaintiff Walterlakes would not have purchased the floral arrangement had he known that the product was going to be more expensive than initially listed. Plaintiff Walterlakes and the California Subclass have been misled and unfairly induced to enter into transactions and to overpay for products. As a result of Defendant's unfair, fraudulent, and unlawful practices, misrepresentations, and omissions, Plaintiff Walterlakes and the California Subclass have been injured in the form of the full purchase price of the products purchased from Defendant, or at a minimum, any Surprise Fees that were not disclosed until later stages in the Purchase Flow, which they would not have incurred but for Defendant's unlawful practices. The full amount of losses has not yet been ascertained, but which are believed to exceed the hundreds of thousands, or possibly millions, of dollars in the aggregate. These amounts have been paid to Defendant by Plaintiffs and the Class and should be restored to them.

## COUNT IV
### Violation of California Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200, *et. seq.*
### *(On Behalf of Plaintiff Walterlakes and the California Subclass)*

171.    Plaintiff Walterlakes restates each of the allegations in the preceding paragraphs as if set forth at length herein.

172.    Throughout the class period and continuing to the present, Defendant has and continues to engage in business acts or practices that constitute unfair competition as defined in the Unfair Competition Law, Business and Professions Code § 17200 et seq., in that such business acts and practices are unfair, fraudulent, and unlawful within the meaning of that statute. The business acts and practices engaged in by Defendant that violate the unfair, fraudulent, and unlawful prongs of the Unfair Competition Law include those detailed in Paragraphs 41–89 generally as to the California subclass, as well as Paragraphs 108–19 specifically as to Plaintiff Walterlakes. In particular, throughout the Class Period, Defendant engaged in the specific circumstances set forth in Paragraph 151 to unfairly and deceptively lead Plaintiff Walterlakes and the California Subclass into paying a higher than advertised price for floral arrangements.

### "Unfair" Prong

173.    Under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et. seq., a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not reasonably avoid." *Camacho v. Auto Club of Southern California*, 142 Cal. App. 4th 1394, 1403 (2006).

174.    Defendant's aforementioned actions, including those detailed in Paragraphs 41–89, are unfair.

175.    Defendant knew or should have known of its unfair conduct.

176.    Defendant's unfair actions of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements cause injuries to consumers.

177.    Consumers cannot avoid any of the injuries caused by Defendant's false and misleading advertising of the floral arrangements.

CLASS ACTION COMPLAINT

178.    Some courts conduct a balancing test to decide if a challenged activity amounts to unfair conduct under California Business and Professions Code Section 17200. In doing so, the courts "weigh the utility of the Defendant's conduct against the gravity of the harm alleged to the victim." *Davis v. HSBC Bank Nevada, N.A.*, 691 F. 3d 1152, 1169 (9th Cir. 2012).

179.    Defendant's unfair actions of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements results in financial harm to consumers. Thus, the utility of Defendant's conduct is vastly outweighed by the gravity of its harm.

180.    Some courts require the "unfairness must be tethered to some legislative declared policy or proof of some actual or threatened impact on competition." *Lozano v. AT&T Wireless Servs. Inc.*, 504 F. 3d 718, 735 (9th Cir. 2007).

181.    Defendant's unfair practice of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements constitutes an unfair business practice within the meaning of California Business & Professions Code Section 17200.

### **"Fraudulent" Prong**

182.    California Business and Professions Code Section 17200, et seq., considers conduct fraudulent and prohibits said conduct if it is likely to deceive members of the public. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1267 (1992).

183.    Defendant's fraudulent actions of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements is likely to deceive members of the public.

184.    Defendant's actions, as alleged in the preceding paragraphs, including Paragraphs 41-89, are false, deceptive, misleading, and unreasonable and constitutes fraudulent conduct.

185.    Defendant knew or should have known of its fraudulent conduct.

186.    Defendant's fraudulent practice of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements, including making the material misrepresentations and omissions by Defendant detailed in paragraph 151 constitute a fraudulent business practice within the meaning of California Business & Professions Code Section 17200.

CLASS ACTION COMPLAINT

**"Unlawful" Prong**

187.    California Business and Professions Code Section 17200, et seq., identifies violations of other laws as "unlawful practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC Mortg. Corp.*, 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

188.    As alleged in Counts I, II, and III, Defendant's advertising of its floral arrangementsas alleged in the preceding paragraphs, including those in Paragraphs 41–89 violates the CLRA, Cal. Civil Code Section 1750, et seq., and California FAL, Business and Professions Code Section 17500, et seq.

189.    Defendant knew or should have known of its unlawful conduct.

190.    Defendant's unlawful practice of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements in violation of the CLRA and FAL constitute a unlawful business practice within the meaning of California Business & Professions Code Section 17200.

191.    Relief Should Be Granted for Defendant's Violations of All Three Prongs.

192.    There were reasonably available alternatives to further Defendant's legitimate business interests. Defendant could have truthfully advertised the true and full price of its floral arrangements upfront. Defendant could have marketed the floral without making any false statements about the ultimate price consumers must pay for the floral arrangements, and without omitting the disclosure that the listed purchase price may be subject to additional Surprise Fees.

193.    All of the conduct alleged herein occurred and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

194.    There were reasonably available alternatives to further Defendant's legitimate business interests other than the conduct described herein.

195.    All of the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on tens of thousands of occasions daily (if not more).

196.    Plaintiff Walterlakes and the California Subclass have suffered injury in fact and have lost money as a result of Defendant's unfair, fraudulent, and unlawful conduct. Plaintiff Walterlakes would not have purchased the floral arrangement had he known that the product was going to be more expensive than initially listed. Plaintiff Walterlakes and the California Subclass have been misled and unfairly induced to enter into transactions and to overpay for products. As a result of Defendant's unfair, fraudulent, and unlawful practices, misrepresentations, and omissions, Plaintiff Walterlakes and the California Subclass have been injured in the form of the full purchase price of the products purchased from Defendant, or at a minimum, any Surprise Fees that were not disclosed until later stages in the Purchase Flow, which they would not have incurred but for Defendant's unlawful practices. The full amount of losses has not yet been ascertained, but which are believed to exceed the hundreds of thousands, or possibly millions, of dollars in the aggregate. These amounts have been paid to Defendant by Plaintiffs and the Class and should be restored to them.

197.    Pursuant to Business and Professions Code Section 17203, Plaintiff Walterlakes and the California Subclass seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of unfair, deceptive, and unlawful advertising of its floral arrangements, including an order of this Court enjoining Defendant from continuing to engage, use, or employ its unfair practice of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements and to require Defendant to cease charging any Surprise Fees that are not conspicuously disclosed at the preliminary stages of the Purchase Flow, and additionally request an order awarding Plaintiff restitution of the money wrongfully acquired by Defendant in an amount to be determined at trial.

/ / /

/ / /

## COUNT V
**Violation of New York Deceptive and Unfair Trade Practices Act,**
**N.Y.G.B.L. § 349**
***(On Behalf of Plaintiff Mahabal and the New York Subclass)***

198.    Plaintiff Mahabal restates each of the allegations in the preceding paragraphs as if set forth at length herein.

199.    This cause of action is brought pursuant to New York's Gen. Bus. Law section 349, et seq., on behalf of Plaintiff Mahabal and a New York Subclass who purchased Defendant's floral arrangements within the applicable statute of limitations.

200.    New York Gen. Bus. Law, section 349, et seq. prohibits the "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in th[e] state."

201.    Defendant's deceptive acts include those detailed in Paragraphs 41–89 generally as to the New York subclass, as well as Paragraphs 120–30 specifically as to Plaintiff Mahabal. In particular, throughout the Class Period, Defendant engaged in the specific circumstances set forth in Paragraph 151 to unfairly and deceptively lead Plaintiff Mahabal and the New York Subclass into paying a higher than advertised price for floral arrangements.

202.    Defendant's aforementioned actions, including those detailed in Paragraphs 41–88, led to, and continues to lead to, consumers paying a higher price for the floral arrangement than they would have purchased if not for the misleading Purchase Flow which obscured the true and full price of the arrangement. Plaintiff Mahabal would not have purchased the floral arrangement had she known that the product was going to be more expensive than initially listed. Defendant's unfair actions of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements is likely to deceive consumers into purchasing the floral arrangements because the listed "bait" price is material to the average, ordinary, and reasonable consumer.  Defendants knew consumers would purchase the Products once they have "anchored" on the falsely listed "bait" price.  By advertising so prominently only the "bait" price, Defendants have demonstrated that the "bait" price is material to consumers. As a result of their deceptive acts and practices, Defendants

have sold tens of thousands (or more) of floral arrangements to unsuspecting consumers across New York. If Defendants had advertised their floral arrangements truthfully and in a non-misleading fashion, Plaintiff Mahabal, and the New York Subclass Members, would not have purchased the floral arrangements at all, or would not have paid as much.

203.    Plaintiff Mahabal and the New York Subclass reasonably and detrimentally relied on the material and falsely listed "bait" price to their detriment, in that they purchased the floral arrangements.

204.    Plaintiff Mahabal has standing to pursue this claim because Plaintiff Mahabal has suffered an injury-in-fact and have lost money or property as a result of Defendants' deceptive acts and practices. Specifically, Plaintiff Mahabal purchased the Products for her own personal use.  In doing so, Plaintiff Mahabal relied upon Defendant's false, misleading, and deceptive representations of the "bait" price.  Plaintiff Mahabal spent money in the transaction that she otherwise would not have spent had she known the true and full price of Defendant's floral arrangements.

205.    Plaintiff Mahabal and the New York Subclass have suffered injury in fact and have lost money as a result of Defendant's unfair, fraudulent, and unlawful conduct. Plaintiff Mahabal would not have purchased the floral arrangement had she known that the product was going to be more expensive than initially listed. Plaintiff Mahabal and the New York Subclass have been misled and unfairly induced to enter into transactions and to overpay for products. As a result of Defendant's unfair, fraudulent, and unlawful practices, misrepresentations, and omissions, Plaintiff Mahabal and the New York Subclass have been injured in the form of the full purchase price of the products purchased from Defendant, or at a minimum, any Surprise Fees that were not disclosed until later stages in the Purchase Flow, which they would not have incurred but for Defendant's unlawful practices. The full amount of losses has not yet been ascertained, but which are believed to exceed the hundreds of thousands, or possibly millions, of dollars in the aggregate. These amounts have been paid to Defendant by Plaintiffs and the Class and should be restored to them.

206.    Accordingly, Plaintiff Mahabal seeks to enjoin Defendant's unlawful acts and practices and to recover her actual damages or fifty (50) dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

**COUNT VI**
**Violation of False Advertising of the New York Deceptive Acts and Practices Act**
**N.Y.G.B.L. § 350**
*(On Behalf of Plaintiff Mahabal and the New York Subclass)*

207.    Plaintiff Mahabal re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

208.    Plaintiff Mahabal brings this claim individually and on behalf of the New York Subclass who purchased Defendant's floral arrangements within the applicable statute of limitations.

209.    The New York False Advertising Law, codified at Gen. Bus. Law section 350, et seq., prohibits advertising that "is misleading in a material respect."

210.    Defendant's business acts and practices in violation of section 350 include those detailed in Paragraphs 41–89 generally as to the New York subclass, as well as Paragraphs 120–30 specifically as to Plaintiff Mahabal. In particular, throughout the Class Period, Defendant engaged in the specific circumstances set forth in Paragraph 151 to unfairly and deceptively lead Plaintiff Mahabal and the New York Subclass into paying a higher than advertised price for floral arrangements.

211.    Defendant's unfair actions of using a misleading Purchase Flow to obscure the full and true price of its floral arrangements were false because the floral arrangement's true and full price is inflated by a hidden Surprise Fee. The representation made throughout the course of conduct detailed in Paragraphs 41–89 were material because they are likely to mislead a reasonable consumer into purchasing the floral arrangements.

212.    In making and disseminating the false representations alleged herein, Defendant knew or should have known that the representations were untrue or misleading.

213.     Defendant's misleading Purchase Flow obscured the full and true price of its floral arrangements and was specifically designed to induce reasonable consumers, like Plaintiff Mahabal and the New York Subclass, to purchase the floral arrangements.

214.     Plaintiff Mahabal and the New York Subclass have suffered injury in fact and have lost money as a result of Defendant's unfair, fraudulent, and unlawful conduct. Plaintiff Mahabal would not have purchased the floral arrangement had she known that the product was going to be more expensive than initially listed. Plaintiff Mahabal and the New York Subclass have been misled and unfairly induced to enter into transactions and to overpay for products. As a result of Defendant's unfair, fraudulent, and unlawful practices, misrepresentations, and omissions, Plaintiff Mahabal and the New York Subclass have been injured in the form of the full purchase price of the products purchased from Defendant, or at a minimum, any Surprise Fees that were not disclosed until later stages in the Purchase Flow, which they would not have incurred but for Defendant's unlawful practices. The full amount of losses has not yet been ascertained, but which are believed to exceed the hundreds of thousands, or possibly millions, of dollars in the aggregate. These amounts have been paid to Defendant by Plaintiffs and the Class and should be restored to them.

215.     As a direct and proximate result of Defendant's misconduct, Plaintiff Mahabal and the New York Subclass were injured in that they: (1) paid money for the floral arrangements that were not priced what they were originally listed for; (2) and were deprived of the benefit of the bargain because the arrangements they purchased were differently priced than what Defendant advertised. Accordingly, on behalf of Plaintiff Mahabal and the Members of the New York Subclass, Plaintiff Mahabal seeks to enjoin Defendant's unlawful acts and practices and recover their actual damages or five hundred (500) dollars per violation, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## VIII.   <u>PRAYER FOR RELIEF</u>

216.     WHEREFORE, Plaintiffs, individually and on behalf of the Class defined herein, pray for judgment and relief on all Causes of Action as follows:

a) Certification: For an order certifying this action as a class action, appointing Plaintiffs as the Class Representatives, and appointing Plaintiffs' Counsel as Class Counsel;

b) Declaratory Relief: For an order declaring that Defendant's conduct violates the statutes and laws which underpin this action;

c) Injunction: For an order requiring Defendant to immediately cease and desist from selling the unlawful Products in violation of law; enjoining Defendant from continuing to market, advertise, distribute, and sell the Products in the unlawful manner described herein; requiring Defendant to engage in an affirmative advertising campaign to dispel the public misperception of the Products resulting from Defendant's unlawful conduct; and requiring all further and just corrective action, consistent with permissible law and pursuant to only those causes of action so permitted;

d) Damages/Restitution/Disgorgement: For an order awarding monetary compensation in the form of damages, restitution, and/or disgorgement to Plaintiffs and the Class, consistent with permissible law and pursuant to only those causes of action so permitted;

e) Attorneys' Fees and Costs: For an order awarding attorneys' fees and costs, consistent with permissible law and pursuant to only those causes of action so permitted;

f) Pre/Post-Judgment Interest: For an order awarding pre-judgment and post-judgment interest, consistent with permissible law and pursuant to only those causes of action so permitted; and

g) All Just and Proper Relief: For such other and further relief as the Court deems just and proper.

## IX.    <u>JURY TRIAL DEMANDED</u>

217.    Plaintiffs demand a jury trial on all triable issues.


DATED: January 29, 2025                      **CLARKSON LAW FIRM, P.C.**

                                             */s/ Ryan J. Clarkson*
                                             Ryan J. Clarkson (NY Bar No. 5786967)
                                             *rclarkson@clarksonlawfirm.com*
                                             22525 Pacific Coast Highway
                                             Malibu, CA 90265
                                             Tel: (213) 788-4050
                                             Fax: (213) 788-4070

                                             Kristen Simplicio (*pro hac vice* forthcoming)
                                             *ksimplicio@clarksonlawfirm.com*
                                             1050 Connecticut Ave NW, Ste 500
                                             Washington, DC 20036
                                             Tel.: (202) 688-2105
                                             Fax: (213) 788-4070

                                             *Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT